[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APRIL 7, 2008
THOMAS K. KAHN
CLERK

_____

No. 07-11574

_____

D. C. Docket No. 06-01678 CV-JTC-1

NORTH AMERICAN MEDICAL CORPORATION,
ADAGEN MEDICAL INTERNATIONAL, INC.,
Georgia corporations,

Plaintiffs-Appellees,

versus

AXIOM WORLDWIDE, INC.,
a Florida corporation,
JAMES GIBSON, JR.,
NICHOLAS EXARHOS,
residents of Florida,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(April 7, 2008)**

Before ANDERSON, BLACK and HILL, Circuit Judges.

ANDERSON, Circuit Judge:

Defendants-Appellants Axiom Worldwide, Inc. ("Axiom"), James Gibson, Jr., and Nicholas Exarhos appeal the district court's grant of a preliminary injunction in favor of the Plaintiffs-Appellees, North American Medical Corporation ("NAM") and Adagen Medical International, Inc. ("Adagen").[1] The district court enjoined the Defendants-Appellants from engaging in certain alleged acts of trademark infringement and false advertising. We now affirm the district court's order in part and vacate and remand it in part.

## I. STANDARD OF REVIEW

We will reverse a grant of a preliminary injunction only if the district court abused its discretion. Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc., 299 F.3d 1242, 1246 (11th Cir. 2002). We review the district court's findings of fact under a clearly erroneous standard, noting that a finding of fact is clearly erroneous only when "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Id. (quoting Univ. of Ga. Athletic Ass'n v.

---

[1] Defendant-Appellant Ren Scott originally participated in this appeal as well, but we previously granted a joint motion to voluntarily dismiss him from the case after he reached a settlement agreement with the Plaintiffs-Appellees. Accordingly, we need not address Scott's argument that the district court lacked personal jurisdiction over him.

Laite, 756 F.2d 1535, 1543 (11th Cir.1985)). We review the district court's conclusions of law de novo, "understanding that '[a]pplication of an improper legal standard . . . is never within a district court's discretion.' " Id. (quoting Am. Bd. of Psychiatry & Neurology, Inc. v. Johnson-Powell, 129 F.3d 1, 2-3 (1st Cir. 1997)).

## II. BACKGROUND

NAM designs and manufacturers physiotherapeutic spinal devices, commonly known as traction devices, which are used, for example, to treat lower back pain. Adagen is an authorized distributor of NAM's devices. Axiom, a competitor of NAM's, manufacturers a physiotherapeutic device known generally as the DRX 9000. Gibson and Exharhos are, respectively, the president and vice president of Axiom. In the present lawsuit, NAM and Adagen allege that Axiom engaged in unfair competition by infringing NAM's trademarks and by issuing false advertising regarding the DRX 9000.

The trademark infringement claims stem from Axiom's use of two of NAM's registered trademarks: the terms "Accu-Spina" and "IDD Therapy."

Axiom included these terms on its website within meta tags.[2]  Although Axiom's

website never displayed NAM's trademarked terms to visitors and never

mentioned NAM or NAM's products, Axiom nonetheless included the terms

within its meta tags to influence Internet search engines.  For instance, evidence in

this case indicated that, before Axiom removed these meta tags from its website, if

a computer user entered the trademarked terms into Google's Internet search

engine, Google listed Axiom's website as the second most relevant search result.

In addition, Google provided the searcher with a brief description of Axiom's

website, and the description included these terms and highlighted them.[3]

The false advertising claims stem from certain statements that Axiom made

about its product, the DRX 9000.  In particular, two representations by Axiom are

---

[2]  Meta tags consist of words and phrases that are intended to describe the contents of a
website.  These descriptions are embedded within the website's computer code.  Although
websites do not display their meta tags to visitors, Internet search engines utilize meta tags in
various ways.  First, when a computer user enters particular terms into an Internet search engine,
the engine may rank a webpage that contains the search terms within its meta tags higher in the
list of relevant results.  Second, when a particular webpage is listed as a relevant search result,
the search engine may use the meta tags to provide the searcher a brief description of the
webpage.  See Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp., 174 F.3d 1036, 1045 (9th
Cir. 1999).

[3]  Incidentally, Axiom makes a brief, conclusory argument that no evidence exists to
establish that the meta tags affected the search results.  We disagree.  The evidence indicates that
nowhere in Axiom's website do NAM's two trademarked terms appear (e.g., in comparative
adverstising).  Rather, the terms appear only in Axiom's meta tags.  We cannot conclude that the
district court's implied finding of a causal relationship is clearly erroneous.

4

relevant to this appeal.[4]  First, Axiom represented in various ways that an affiliation exists between NASA and Axiom or between NASA and the DRX 9000.  Second, Axiom asserted in advertisements that the DRX 9000 is FDA "approved."

The district court issued a preliminary injunction in favor of NAM and Adagen, prohibiting Axiom from using NAM's trademarks within meta tags and prohibiting Axiom from making the challenged statements about the DRX 9000. Among other things, the district court specifically found that Axiom's use of NAM's trademarks created a likelihood of confusion, and the court also found that Axiom's advertising statements are literally false and material to consumers' purchasing decisions.

### III. DISCUSSION

At the outset, we note that a district court may grant a preliminary injunction only if the movant establishes the following: "(1) a substantial likelihood of success on the merits of the underlying case, (2) the movant will

---

[4]  A third representation by Axiom, that Axiom patented the DRX 9000 or any portion or feature thereof, was also deemed literally false by the district court.  Because Axiom's brief on appeal fails to challenge this aspect of the district court's ruling, however, Axiom has waived the issue.  This circuit has consistently held that issues not raised on appeal are abandoned. See, e.g., Greenbriar, Ltd. v. City of Alabaster, 881 F.2d 1570, 1573 n.6 (11th Cir. 1989).

suffer irreparable harm in the absence of an injunction, (3) the harm suffered by the movant in the absence of an injunction would exceed the harm suffered by the opposing party if the injunction issued, and (4) an injunction would not disserve the public interest." Johnson & Johnson, 299 F.3d at 1246-47. Axiom challenges the district court's order on multiple grounds. First, Axiom argues that NAM and Adagen failed to establish a substantial likelihood of success on the merits of their trademark infringement claims. Specifically, Axiom urges that its use of NAM's trademarks in invisible meta tags is not a "use in commerce" and does not create a likelihood of confusion. Second, Axiom argues that NAM and Adagen also failed to establish a substantial likelihood of success on the merits of their false advertising claims. Specifically, Axiom asserts that its advertising statements are not literally false and are not material to consumers' purchasing decisions. Third and finally, Axiom argues that, even assuming NAM and Adagen are likely to succeed on the merits of these unfair competition claims, the district court erred by categorically presuming that any plaintiff with a viable unfair competition claim will always suffer irreparable harm in the absence of a preliminary injunction. We address each point in turn.

A. Likelihood of Success on the Merits of the Trademark Infringement Claims

Because Axiom's use of NAM's trademarks constitutes a "use in commerce" in connection with the advertisement of goods, and because the district court did not clearly err in its factual finding that a likelihood of confusion exists, NAM and Adagen demonstrated a likelihood of success on the merits of their trademark infringement claims. Regarding trademark infringement, the Lanham Act provides, in relevant part, as follows:

> (1) Any person who shall, without the consent of the registrant –
>
>> (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . .
>
> shall be liable in a civil action by the registrant for the remedies hereinafter provided.

15 U.S.C. § 1114(1)(a) (2006). To prevail on a claim of trademark infringement in this case, plaintiffs must establish: (1) that they possess a valid mark, (2) that the defendants used the mark, (3) that the defendants' use of the mark occurred "in commerce," (4) that the defendants used the mark "in connection with the sale . . . or advertising of any goods," and (5) that the defendants used the mark in a manner likely to confuse consumers. See 1-800 Contacts, Inc. v. WhenU.com, Inc., 414 F.3d 400, 406-07 (2d Cir. 2005); People for Ethical Treatment of

7

Animals v. Doughney, 263 F.3d 359, 364 (4th Cir. 2001).

Axiom does not challenge the validity of NAM's marks, nor does Axiom dispute that its use of NAM's trademarks affects interstate commerce.[5] Thus, although Axiom purports to challenge whether its placing of NAM's trademarks in its meta tags is a "use in commerce" and whether such use is likely to confuse consumers, Axiom's arguments actually focus only on the second, fourth, and fifth elements. Moreover, because Axiom separates its "use" challenge from its "likelihood of confusion" challenge, we first address the second and fourth elements together (i.e., whether there was a "use . . . in connection with the sale . . . or advertising of any goods"), and we then address the fifth element (i.e., whether such use was in a manner "likely to confuse consumers").

    1.  Use in Commerce in Connection with the Sale or Advertising of Any Goods

Axiom briefly argues that placing a competitor's trademarks within meta tags, which consumers never view, does not constitute a "use" as required to find trademark infringement under the Lanham Act. However, we readily conclude that the facts of the instant case do involve a "use" as contemplated in the Lanham

[5] The Lanham Act defines "commerce" broadly for jurisdictional purposes as "all commerce which may lawfully be regulated by Congress." 15 U.S.C. § 1127 (2006); see also Bosely Med. Inst., Inc. v. Kremer, 403 F.3d 672, 677 (9th Cir. 2005)(describing "use in commerce" as a "jurisdictional predicate"); Planetary Motion, Inc. v. Techsplosion, Inc., 261 F.3d 1188, 1194-95 (11th Cir. 2001) (same).

Act – that is, a use in connection with the sale or advertisement of goods. In deciding whether Axiom has made an infringing "use," we focus on the plain language of § 1114(1)(a), which, as noted above, requires a "use in commerce . . . of a registered mark in connection with the sale . . . or advertising of any goods." 15 U.S.C. § 1114(1)(a). The facts of the instant case are absolutely clear that Axiom used NAM's two trademarks as meta tags as part of its effort to promote and advertise its products on the Internet. Under the plain meaning of the language of the statute, such use constitutes a use in commerce in connection with the advertising of any goods. Accordingly, we readily conclude that plaintiffs in this case have satisfied that (1) they possessed a valid mark, (2) that the defendant used the mark, (3) that the defendant's use of the mark occurred "in commerce," and (4) that the defendant used the mark "in connection with the sale . . . or advertising of any goods."

In an effort to avoid the foregoing plain meaning of the statutory language, Axiom places its sole reliance on the Second Circuit's 1-800 Contacts case. In that case, whenever a consumer who had installed the defendant's computer program clicked on or searched for the plaintiff's website address, the program generated on the consumer's screen not only the website sought (e.g., plaintiff's), but also a second window displaying pop-up ads for the defendant's alternative,

9

competing products. 414 F.3d at 404-05. The Second Circuit ultimately held, as a matter of law, that such use of the web address is not a "use in commerce." Id. at 403.

In so holding, the Second Circuit emphasized that the defendant did not use plaintiff's trademark, but rather used its website address, which differed slightly from the mark. Id. at 408-09. Indeed, the court explicitly declined to express an opinion on the appropriate result if defendant had in fact used plaintiff's trademark. Id. at 409 n.11. Even more crucial to the Second Circuit's holding, the court emphasized repeatedly the fact that the defendant never caused plaintiff's trademarks to be displayed to a consumer. Id. at 408-410. The court explained that the defendant used plaintiff's web address merely in the internal directory of its proprietary software, which was "inaccessible to both the C-user and the general public." Id. at 409. Explaining the significance of the fact that the defendant never caused plaintiff's trademark to be displayed to the consumer, the court stated that defendant's use of plaintiff's "website address in the directory does not create a possibility of visual confusion with 1-800's mark." Id.

In rejecting Axiom's invitation to rely on 1-800 Contacts, we initially note that the above two key facts are not present in the case before us. First, unlike the defendant in 1-800 Contacts, Axiom in the instant case did use NAM's two

10

trademarks in its meta tags; it did not merely use NAM's unprotected website address. Second, and again unlike in 1-800 Contacts, the defendant-Axiom in this case did cause plaintiff's trademark to be displayed to the consumer in the search results' description of defendant's site.[6] Thus, the facts of the instant case stand in stark contrast to those in 1-800 Contacts, and Axiom's reliance on the Second Circuit's opinion is therefore misplaced.

Furthermore, to the extent the 1-800 Contacts court based its "use" analysis on the fact that the defendant did not *display* the plaintiff's trademark, we think the Second Circuit's analysis is questionable. Although we believe that the absence of such a display is relevant in deciding whether there is a likelihood of confusion, we believe that, when the analysis separates the element of likelihood of confusion from the other elements, this fact is not relevant in deciding whether there is a use in commerce in connection with the sale or advertising of any goods. Because the Second Circuit did separate its analysis in this manner, and did purport not to address the likelihood of confusion issue, see id. at 406, its reliance on the fact that there was no display of the plaintiff's trademark (and thus no

---

[6] As described more fully below, when a consumer in this case entered NAM's trademarks into a search engine, the search results displayed Axiom's website along with a description thereof, which description included NAM's trademarks in a manner likely to confuse consumers and suggest some relationship between Axiom and NAM.

11

possibility of confusion) undermines the persuasiveness of its analysis of the separate elements of use in commerce in connection with the sale or advertising of any goods.

In sum, we conclude that Axiom's reliance on the Second Circuit decision in 1-800 Contacts is misplaced.[7] We conclude that the plain meaning of the statutory language clearly indicates that Axiom's use of NAM's trademarks as meta tags constitutes a "use in commerce . . . in connection with the sale . . . or advertising of any goods" under the facts of this case. Thus, we turn to the fifth, and final, element that plaintiffs' must establish – that such use was "likely to cause confusion."

### 2. Likelihood of Confusion

---

[7] We also note that several cases, including 1-800 Contacts, refer to 15 U.S.C. § 1127 with respect to the definition of "use in commerce" in the infringement context. See, e.g., 1-800 Contacts, 414 F.3d at 407, 409. However, a leading treatise on trademarks notes that § 1127 "defines the kind of 'use' needed to acquire registerable trademark rights – not to infringe them." J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 23:11.50 (4th ed. 2003). McCarthy explains that § 1127 harked back to the common law "affixation" requirement, a formalistic prerequisite to achieving technical trademark status. Id. By contrast, McCarthy observes that § 1114(1) merely requires that a plaintiff's proof of infringement establish a use in commerce "in connection with the sale . . . or advertising of any goods." Id. In any event, McCarthy notes that the cases that inappropriately cite § 1127 in the context of an infringing "use" analysis do not apply that section's affixation limitations. Id. Finally, McCarthy cites Ninth Circuit opinions as correctly construing § 1127. Id. (citing, for example, Bosely Med. Inst., Inc. v. Kremer, 403 F.3d 672 (9th Cir. 2005)). In Kremer, the Ninth Circuit noted that § 1127 is expressly prefaced with the caveat: "unless the contrary is plainly apparent from the context." 403 F.3d at 677. Thus, the Kremer court held that the appropriate issue was whether the use was "in connection with the sale of goods or services." Id.; see also Playboy Enters., Inc. v. Netscape Commc'ns Corp., 354 F.3d 1020, 1024 n.11 (9th Cir. 2004).

12

The district court's finding that a likelihood of confusion exists is not clearly erroneous. Seven factors are relevant when determining whether a likelihood of confusion exists:

> (1) the strength of the plaintiff's mark; (2) the similarity between the plaintiff's mark and the allegedly infringing mark; (3) the similarity between the products and services offered by the plaintiff and defendant; (4) the similarity of the sales methods; (5) the similarity of advertising methods; (6) the defendant's intent, e.g., does the defendant hope to gain competitive advantage by associating his product with the plaintiff's established mark; and (7) actual confusion.

Alliance Metals, Inc., of Atlanta v. Hinely Indus., Inc., 222 F.3d 895, 907 (11th Cir. 2000). "The findings as to each factor, and as to the ultimate conclusion regarding whether or not a likelihood of confusion existed, are subject to the clearly erroneous standard of review." Frehling Enters., Inc. v. Int'l Select Group, Inc., 192 F.3d 1330, 1335 (11th Cir. 1999).

The district court expressly acknowledged the foregoing factors, but it made an explicit finding only with respect to the ultimate conclusion that there was a likelihood of confusion. Regarding that issue, Axiom's brief on appeal did not challenge the district court's implied findings with respect to any of the subsidiary factors (i.e., the foregoing seven factors). Rather, Axiom challenged only: (1) the district court's implied finding that Axiom's use of NAM's two trademarks as

13

meta tags caused the Internet search results at issue,[8] and (2) the district court's

reliance on Brookfield Communications, Inc. v. West Coast Entertainment Corp.,

174 F.3d 1036 (9th Cir. 1999), and Promatek Industries, Ltd. v. Equitrac Corp.,

300 F.3d 808 (7th Cir. 2002), with respect to the nature of meta tags and search

engines.  Axiom argues that those opinions erroneously misled the district court to

find a likelihood of confusion; Axiom contends that its use of the meta tags was

instead analogous to a store placing its own generic brand next to a brand name

product on the store's shelf.  Because Axiom has not challenged the district

court's implied findings with respect to the subsidiary factors, any such challenge

is deemed abandoned.  Indeed, it is apparent that the marks are not only similar,

but identical; Axiom's meta tags precisely mimic NAM's "IDD Therapy" and

"Accu-Spina" trademarks.  Axiom concedes that it is a direct competitor of NAM.

It is also apparent that Axiom intended to gain a competitive advantage by

associating its product with NAM's trademark.  Finally, the litigation on appeal

has proceeded on the assumption that there would be a likelihood of confusion,

unless Axiom's arguments about the nature of meta tags and search engines (i.e.,

---

[8] As noted above, we summarily reject this argument.  See supra note 3.  NAM's trademarks appeared in the Google search result as part of the description of Axiom's website. Because on this record the only possible cause for this is Axiom's use of the trademarks as meta tags, we readily conclude that the district court was not clearly erroneous in its implicit finding that the meta tags caused the search result and thus the likelihood of confusion.

14

Axiom's challenge to Brookfield and Promatek) prevailed.

Therefore, we address Axiom's challenge to Brookfield and Promatek. In the leading case on this issue, the Ninth Circuit concluded that the Lanham Act bars a defendant from including in its meta tags a competitor's trademark or confusingly similar terms. Brookfield, 174 F.3d at 1065. Accordingly, the Brookfield court enjoined one online video store, West Coast, from using in its meta tags the trademark (and similarly confusing terms) of a competing online video store, Movie Buff. Id. at 1066-67. Despite its ultimate conclusion, the Brookfield court conceded that even when a consumer who enters a company's trademark into a search engine sees a list displaying a competitor's website in addition to the trademark holder's website, the consumer will often be able to find the particular website he is seeking by simply scanning the list of results. Id. at 1062. The court also acknowledged that even if the web user chooses the competitor's website from the list, assuming the allegedly infringed trademark is not actually displayed by the competitor, "it is difficult to say that a consumer is likely to be confused about whose site he has reached or to think that [the plaintiff] somehow sponsors [the competitor's] web site." Id. Nevertheless, the Brookfield court concluded that the competitor's use of the trademark "in metatags will still result in what is known as initial interest confusion." Id. That is, "[a]lthough

15

there is no source confusion in the sense that consumers know they are patronizing [the competitor] rather than [the plaintiff], there is nevertheless initial interest confusion in the sense that, by using [the trademark] to divert people looking for [the plaintiff's] web site, [the competitor] improperly benefits from the good will that [the plaintiff] has developed in its mark." Id.

In the other case relied upon by the district court, the Seventh Circuit faced facts similar to those in Brookfield and agreed with the Brookfield court's analysis. Promatek, 300 F.3d at 810-13. Other courts, however, have criticized various aspects of the Brookfield opinion. See, e.g., 1-800 Contacts, 414 F.3d at 410-11; Playboy Enters., Inc. v. Netscape Commc'ns Corp., 354 F.3d 1020, 1034-36 (9th Cir. 2004) (Berzon, J., concurring); J.G. Wentworth, S.S.C. Ltd. P'ship v. Settlement Funding LLC, No. 06-0597, 2007 WL 30115, at *6-*7 (E.D. Pa. Jan. 4, 2007); see also J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 25:69 (4th ed. 2003) (discussing meta tags, initial interest confusion, and criticisms of the Brookfield court's approach).

Like the Brookfield and Promatek courts, we ultimately conclude that a company's use in meta tags of its competitor's trademarks may result in a likelihood of confusion. However, because NAM and Adagen have demonstrated

16

a likelihood of actual *source* confusion,[9] we need not decide, as those courts did, whether initial interest confusion alone may provide a viable method of establishing a likelihood of confusion. Unlike those courts, we are not faced with a situation where the trademarks are used without being displayed to consumers.

In Brookfield and Promatek, consumers who entered the plaintiff's trademarks into a search engine saw a list displaying the competitor's website in addition to the trademark holder's website *without* any other indication from the search results that the competitor's website is sponsored by the plaintiff or related to the plaintiff's trademarks. In contrast, in the instant case, when consumers entered NAM's trademarks into a search engine, the search results not only displayed Axiom's competing website, but they also included a brief description of Axiom's website, which description included and highlighted NAM's trademarked terms. That is, the evidence in the instant case specifically shows that if consumers searched with Google for the terms "IDD Therapy" and "Accu-Spina," the first listed result was a legitimate website sponsored by NAM, the

---

[9] "Source confusion" exists because consumers are likely to be confused as to whether Axiom's products have the same source or sponsor as NAM's or whether there is some other affiliation or relationship between the two. As has been noted by the Eighth Circuit, "[i]f the products are closely related, and it is reasonable for consumers to believe the products come from the same source, confusion is more likely. Davis v. Walt Disney Co., 430 F.3d 901, 904 (8th Cir. 2005).

17

owner of these trademarks, and the second entry in the search results was Axiom's competing website. Furthermore, and in contrast to Brookfield and Promatek, as noted above, the search results not only listed the competitor's (i.e., Axiom's) web address, but they also included a brief description of the Axiom's site, and this description included and highlighted both of NAM's trademarked terms, "IDD Therapy" and "Accu-Spina," in addition to Axiom's competing products. Consumers viewing these search results would be led to believe that Axiom's products have the same source as the products of the owner of the "IDD Therapy" and "Accu-Spina" trademarks, or at least that Axiom distributed or sold all of the products to which the brief description referred, or that Axiom was otherwise related to NAM. This, of course, is misleading to the consumer because Axiom is not related in any way to NAM, nor does Axiom distribute or sell the products of NAM. Moreover, there was nothing in Axiom's website itself to disabuse consumers of the notion (suggested by the Google search) that there is some relationship between Axiom and NAM. In other words, if consumers accessed Axiom's website after viewing the Google search results, they would be told all about Axiom's products but would be met with utter silence with respect to NAM's products. For example, there was no comparative advertising in Axiom's website which would have made clear to consumers that NAM's and Axiom's

18

products are competing items.   Thus, the factual situation in the instant case is that Axiom's use of the meta tags caused a likelihood of actual consumer confusion as to source.

The instant case is more like Playboy Enterprises, Inc. v. Netscape Communications Corp., 354 F.3d 1020 (9th Cir. 2004), than Brookfield or Promatek.  In Playboy, the defendant, Netscape, sold advertisements to competitors of Playboy and then caused its search engine to pop up banner ads of its advertisers.  Playboy, 354 F.3d 1023.  The ads appeared when the consumer-searcher typed in the search terms "Playboy" and/or "Playmate," which are trademark terms owned by Playboy.  Id.  The search engine operated in this manner by using "keying" words in its software.  Id. at 1022-23.  A competitor's ad could be keyed to pop up in a banner ad along the margin of the search result when the searcher entered "Playboy" and/or "Playmate."  Id. at 1023.  Thus, the keying words operated in hidden fashion, much like the meta tags in this case.  Because the banner ads appeared immediately after the searcher typed in the Playboy trademarks, and invited the user to "click here," id. at 1023, and especially because the banner ads did not clearly identify a source (i.e., the sponsor of the ad), id. at 1025 n.16, 1030, the user was likely to be confused regarding the sponsorship of the unlabeled advertisements.  Thus, the Playboy

19

case involved some actual confusion as to source, unlike the situation in Brookfield where there was never any confusion as to source or affiliation. The instant case is more like Playboy than Brookfield. We note, however, that the source confusion in the instant case is considerably more pronounced than in Playboy. In Playboy, there was no explicit representation of a relationship between the source of the ad and Playboy, while there is an explicit representation in this case of some relationship between Axiom and NAM.

Judge Berzon wrote a concurring opinion in Playboy in which he highlighted this distinction from Brookfield. Id. at 1035-36 (Berzon, J., concurring). Judge Berzon criticized Brookfield, arguing that it involved merely a distraction of a potential customer with another choice in a situation in which the customer was never confused as to source. Id. Rather, the potential customer merely was provided an opportunity for another choice, which clearly was not the sponsor of the original search. Id. Such distraction, Judge Berzon pointed out, was very much like the product placement in a department store. Id. at 1035. When a customer walks in, asks for the Calvin Klein section, and is directed to the second floor, no one thinks that there is a trademark infringement because the store has placed its own (or another competitor's) clothing line in a more prominent place as a distraction. Id.

Because Axiom's use of NAM's trademarks as meta tags caused the Google search to suggest that Axiom's products and NAM's products had the same source, or that Axiom sold both lines, or that there was some other relationship between Axiom and NAM, Axiom's use of the meta tags caused a likelihood of actual source confusion. Thus, the instant case is very different from the product placement in a department store. This case is also very different from Brookfield where there was never source confusion. Finally, the instant case is not subject to the criticism leveled by Judge Berzon.

For the foregoing reasons, and under the particular factual circumstances of this case, we cannot conclude that the district court's finding of a likelihood of confusion is clearly erroneous.[10] Because the district court in this case was not clearly erroneous in finding (1) that plaintiffs possessed valid trademarks; (2) that defendants used those marks, (3) in commerce, (4) in connection with the

---

[10] We note that our holding is narrow, and emphasize what kind of case and what kind of facts are *not* before us. This is not a case like Brookfield or Promatek where a defendant's use of the plaintiff's trademark as a meta tag causes in the search result merely a listing of the defendant's website along with other legitimate websites, without any misleading descriptions. This is also not a case where the defendant's website includes an explicit comparative advertisement (e.g., our product uses a technology similar to that of a trademarked product of our competitor, accomplishes similar results, but costs approximately half as much as the competitor's product). Although we express no opinion thereon, such a defendant may have a legitimate reason to use the competitor's trademark as a meta tag and, in any event, when the defendant's website is actually accessed, it will be clear to the consumer that there is no relationship between the defendant and the competitor beyond the competitive relationship. Resolution of the foregoing, as well as other factual situations not before us, appropriately await the day that such factual situations are presented concretely.

advertisement of defendant's goods; and (5) that such use caused a likelihood of confusion to consumers, we conclude that the district court did not err in concluding that plaintiffs demonstrated a likelihood of success with respect to the trademark infringement claim.

B. Likelihood of Success on the Merits of the False Advertising Claims

The district court did not clearly err in its factual findings that Axiom's representations are literally false and material to consumers' purchasing decisions, and thus NAM and Adagen demonstrated a likelihood on success on the merits of their false advertising claims. Regarding false advertising, section 43(a) of the Lanham Act provides, in relevant part, as follows:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which –
>
>> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a) (2006). To establish a likelihood of success on the merits of a false advertising claim under this section, the movant must demonstrate the

22

following: "(1) the ads of the opposing party were false or misleading, (2) the ads deceived, or had the capacity to deceive, consumers, (3) the deception had a material effect on purchasing decisions, (4) the misrepresented product or service affects interstate commerce, and (5) the movant has been – or is likely to be – injured as a result of the false advertising." Johnson & Johnson, 299 F.3d at 1247. Axiom only challenges the district court's conclusions regarding the first and third elements – that is, whether Axiom's statements are literally false[11] and whether the statements have a material effect on purchasing decisions.

### 1. Literal Falsity

The district court did not clearly err when it concluded that Axiom made literally false statements in its advertising.[12] First, the district court did not clearly

---

[11] In the present case, we may only sustain the preliminary injunction as it pertains to literally false statements, as opposed to those that are merely misleading. As we have explained before, "once a court deems an advertisement to be literally false, the movant need not present evidence of consumer deception," but in contrast, "[i]f the court deems an ad to be true but misleading, the movant – even at the preliminary injunction stage – must present evidence of deception." Johnson & Johnson, 299 F.3d at 1247. Here, the district court ruled that NAM and Adagen have not offered evidence of deception at this stage of the proceedings, and therefore the district court acknowledged that it could only enjoin those advertising statements that are literally false, not those that are merely misleading. Even if the statements are misleading (but not false), which would satisfy the first element, the second element would remain unsatisfied at this stage, and a preliminary injunction would be inappropriate. Accordingly, if we rule that any of Axiom's representations are not literally false, we would have to reverse that aspect of the preliminary injunction.

[12] Whether a statement is literally false is a finding of fact, which is reviewed only for clear error. Scotts Co. v. United Indus. Corp., 315 F.3d 264, 274 (4th Cir. 2002) (noting that literal falsity of an advertisement is a factual question subject to the clearly erroneous standard);

err when it ruled that Axiom's claims about an affiliation with NASA are literally false. Although one engineer with NASA training or experience participated in Axiom's development of the DRX 9000, this does not constitute a joint collaboration between NASA and Axiom, nor does it support the claim that NASA engineers developed the DRX 9000 or discovered part of the DRX 9000. Similarly, although the DRX 9000 used some components that NASA also uses, that does not mean the DRX 9000 contains or embodies NASA technology. Perhaps these statements could properly be characterized as misleading rather than literally false, but it is a fine line, and we will only reverse the district court if its findings are clearly erroneous. Based on the entire evidence, we are not left with the definite and firm conviction that the district court clearly erred.[13]

Second, the district court likewise did not clearly err when it ruled that Axiom's claims about the DRX 9000 being FDA "approved" are literally false. The DRX 9000 is a Class II medical device, which is only eligible for FDA

_____

see also Time Warner Cable, Inc. v. DIRECTV, Inc., 497 F.3d 144, 158 (2d Cir. 2007); Hickson Corp. v. N. Crossarm Co., Inc., 357 F.3d 1256, 1261 (11th Cir. 2004) ("The first element of the Lanham Act test requires that the plaintiff show that the statements at issue were either '(1) commercial claims that are literally false as a factual matter . . . .' " (quoting United Indus. Corp. v. Clorox, 140 F.3d 1175, 1180 (8th Cir. 1998))).

[13] Furthermore although Axiom objects that several of its statements regarding NASA only appeared in a video that was never released to any potential consumers, the record contains ample evidence of additional statements, beyond those in the video, that support the district court's ruling of literal falsity.

24

"clearance" rather than FDA "approval;" FDA approval is a separate process that applies only to Class III devices.[14] See 21 U.S.C. §§ 360c, 360e (2006). Compare 21 C.F.R. § 807.81(a)(1) (2006), with 21 C.F.R. § 814.1(c) (2006). As such, Axiom's statements that the DRX 9000 is FDA "approved" are literally false. In fact, FDA regulations state that it "is misleading and constitutes misbranding" to claim FDA approval when a device is merely FDA cleared. See 21 C.F.R. § 807.97 (2006). Although these regulations use the term "misleading," they also describe such a misrepresentation as "misbranding," and again, it is often a matter of degree whether a statement is literally false or merely misleading. Based on the entire evidence, we are convinced that the district court did not clearly err in judging Axiom's statements literally false.[15]

## 2. Materiality to Consumers' Purchasing Decisions

---

[14] Regulation of medical devices is governed by the Federal Food, Drug, and Cosmetic Act, 52 Stat. 1040, as amended by the Medical Device Amendments of 1976, 90 Stat. 539, 21 U.S.C. § 301 et seq. See Buckman Co. v. Plaintiffs' Legal Comm., 531 U.S. 341, 345, 121 S. Ct. 1012, 1015 (2001). Under these regulations, medical devices are divided into three categories: "Class I devices are those that present no unreasonable risk of illness or injury and therefore require only general manufacturing controls; Class II devices are those possessing a greater potential dangerousness and thus warranting more stringent controls; Class III devices 'presen[t] a potential unreasonable risk of illness or injury' and therefore incur the FDA's strictest regulation." Id. (quoting § 360c(a)(1)(C)(ii)(II) (1994 & Supp. V)).

[15] Furthermore, despite Axiom's arguments to the contrary, the district court did not step into the FDA's shoes when it ruled that the DRX 9000 was not approved. The district court was not making a determination whether the device should be approved, it merely noted what the FDA had already determined.

25

The evidence amply supports the district court's conclusion that Axiom's statements are material to consumers' purchasing decisions. Even when a court finds that a defendant's ads are literally false, the plaintiff, to succeed on a claim of false advertising, must still "establish that 'the defendant's deception is likely to influence the purchasing decision.' " Johnson & Johnson, 299 F.3d at 1250 (quoting Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave., 284 F.3d 302, 311 (1st Cir. 2002)). "The materiality requirement is based on the premise that not all deceptions affect consumer decisions." Id.

The types of false claims that the district court enjoined – regarding NASA affiliation and FDA approval – logically would influence a doctor's decision to purchase the DRX 9000 over a competing machine without those qualities. These statements not only represent the quality of the device, but they provide marketing opportunities to the purchasing doctor when he or she in turn is advertising to prospective patients. In fact, after the onset of litigation against Axiom, several doctors who had purchased DRX 9000s sent letters to Axiom expressing their dissatisfaction with the possibility that they might not be able to use Axiom's claims, if the claims proved untrue, to attract patients. These letters provide clear evidence that Axiom's representations would affect doctors' decisions whether to purchase a DRX 9000. Based on this and all other evidence currently in the

26

record, the district court did not err in its conclusion that these false statements are material to consumers' purchasing decisions.

C. Presumptions of Irreparable Harm

Even though we hold that NAM and Adagen have established a substantial likelihood of success on the merits of their trademark infringement and false advertising claims, we must still evaluate whether NAM and Adagen have demonstrated, with respect to each claim, that they will suffer irreparable harm in the absence of an injunction. In reaching its conclusion that NAM and Adagen satisfied this element of the preliminary injunction test, the district court relied on two presumptions, one regarding the infringement claims and one regarding the false advertising claims. For the reasons that follow, we vacate the preliminary injunction with respect to both the trademark claims and the false advertising claims.

1. Irreparable Harm in False Advertising Cases

The district court erred when it presumed that NAM and Adagen would suffer irreparable harm in the absence of a preliminary injunction merely because Axiom's advertisements are literally false. The district court cited a case out of the Northern District of Georgia, Energy Four, Inc. v. Dornier Medical Systems, Inc., 765 F. Supp. 724, 734 (N.D. Ga. 1991), for the following proposition: "In

false advertising cases, '[p]roof of falsity is sufficient to sustain a finding of irreparable injury for purposes of a preliminary injunction.' " This quote, however, is an incomplete statement of the law. Proof of falsity is generally only sufficient to sustain a finding of irreparable injury when the false statement is made in the context of comparative advertising between the plaintiff's and defendant's products. See McCarthy, supra, § 27:37 ("Where the challenged advertising makes a misleading comparison to a competitor's product, irreparable harm is presumed. But if the false advertising is non-comparative and makes no direct reference to a competitor's product, irreparable harm is not presumed." (internal footnotes omitted)). Although some cases, such as the one cited by the district court, employ language that may suggest a more expansive presumption, such quotes take the original principle out of context without explanation.

Once this presumption is properly stated, it becomes evident that NAM and Adagen are not entitled to the presumption's benefits because Axiom's statements, although false, do not mention NAM's products by name or in any way compare Axiom's products with NAM's products.[16] This is not to say that NAM and Adagen could not demonstrate, absent the presumption, that they will suffer

---

[16] In reaching this conclusion, we need not address whether this conclusion is also indicated by eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 126 S. Ct. 1837 (2006).

irreparable harm from Axiom's false advertising, but the district court abused its discretion by relying solely on the presumption to find irreparable harm. Accordingly, we vacate the preliminary injunction to the extent it proscribes Axiom's false advertising, and we remand to the district court to determine whether NAM and Adagen will suffer irreparable harm in the absence of a preliminary injunction.

### 2. Irreparable Harm in Trademark Infringement Cases

Regardless of whether NAM deserves a presumption of irreparable harm on its false advertising claims, our prior cases do extend a presumption of irreparable harm once a plaintiff establishes a likelihood of success on the merits of a trademark infringement claim. Our circuit has acknowledged as much on several occasions. See, e.g., Tally-Ho, Inc. v. Coast Cmty. Coll. Dist., 889 F.2d 1018, 1029 (11th Cir. 1989) (" 'It is generally recognized in trademark infringement cases that (1) there is not [an] adequate remedy at law to redress infringement and (2) infringement by its nature causes irreparable harm.' " (quoting Processed Plastic Co. v. Warner Commc'ns, 675 F.2d 852, 858 (7th Cir. 1982))); McDonald's Corp. v. Robertson, 147 F.3d 1301, 1310 (11th Cir. 1998).

Nonetheless, although established law entitles NAM and Adagen to this presumption in the trademark infringement context, a recent U.S. Supreme Court

29

case calls into question whether courts may presume irreparable harm merely because a plaintiff in an intellectual property case has demonstrated a likelihood of success on the merits.  See generally eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 126 S. Ct. 1837 (2006).  In eBay, after a jury had found patent infringement by the defendant, the district court denied the plaintiff's motion for permanent injunctive relief.  Id. at 390-91, 126 S. Ct. at 1839.  In so doing, the district court "appeared to adopt certain expansive principles suggesting that injunctive relief could not issue in a broad swath of cases."  Id. at 393, 126 S. Ct. at 1840.  On appeal, the Federal Circuit reversed the denial of injunctive relief, articulating a categorical rule that permanent injunctions shall issue once infringement is established.  Id. at 393-94, 126 S. Ct. at 1841.  The Supreme Court reversed the Federal Circuit and admonished both the district and appellate courts for applying categorical rules to the grant or denial of injunctive relief.  Id. at 394, 126 S. Ct. at 1841.  The Court stressed that the Patent Act indicates "that injunctive relief 'may' issue only 'in accordance with the principles of equity.' "  Id. at 393, 126 S. Ct. at 1839.  Because the Court concluded "that neither court below correctly applied the traditional four-factor framework that governs the award of injunctive relief, [it] vacated the judgment of the Court of Appeals, so that the District Court may apply that framework in the first instance."  Id. at 394, 126 S. Ct. at 1841.  The Supreme

Court held that while "the decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts, . . . such discretion must be exercised consistent with traditional principles of equity, in patent disputes no less than in other cases governed by such standards." Id.

Although eBay dealt with the Patent Act and with permanent injunctive relief, a strong case can be made that eBay's holding necessarily extends to the grant of preliminary injunctions under the Lanham Act. Similar to the Patent Act, the Lanham Act grants federal courts the "power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable." 15 U.S.C. § 1116(a) (2006). Furthermore, no obvious distinction exists between permanent and preliminary injunctive relief to suggest that eBay should not apply to the latter. Because the language of the Lanham Act – granting federal courts the power to grant injunctions "according to the principles of equity and upon such terms as the court may deem reasonable" – is so similar to the language of the Patent Act, we conclude that the Supreme Court's eBay case is applicable to the instant case.

However, we decline to express any further opinion with respect to the effect of eBay on this case. For example, we decline to decide whether the district court was correct in its holding that the nature of the trademark infringement gives

31

rise to a presumption of irreparable injury. In other words, we decline to address whether such a presumption is the equivalent of the categorical rules rejected by the Court in eBay. We decline to address such issues for several reasons. First, the briefing on appeal has been entirely inadequate in this regard. Second, the district court has not addressed the effect of eBay. Finally, the district court may well conclude on remand that it can readily reach an appropriate decision by fully applying eBay without the benefit of a presumption of irreparable injury, or it may well decide that the particular circumstances of the instant case bear substantial parallels to previous cases such that a presumption of irreparable injury is an appropriate exercise of its discretion in light of the historical traditions. See eBay, 547 U.S. at 394-97, 126 S. Ct. at 1841-43 (concurring opinions of Chief Justice Roberts and Justice Kennedy, representing the views of seven Justices). Accordingly, we also vacate the preliminary injunction as it applies to the trademark infringement claim, and remand to the district court for further proceedings not inconsistent with this opinion, and with eBay.

## IV. CONCLUSION[17]

---

[17] We also reject Axiom's argument that the district court failed to exercise its discretion with respect to the bond issue. The district court did exercise its discretion not to require a bond.

In sum, we affirm the district court's findings with respect to the likelihood of success on the merits of the trademark claims and the false advertising claims. However, we vacate the preliminary injunction with respect to both, and we remand to the district court for further proceedings not inconsistent with this opinion.

**AFFIRMED IN PART, VACATED AND  REMANDED IN PART**.